IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Janice Denito Branagh, | : | |
| Petitioner | : | |
| | : | No. 1857 C.D. 2019 |
| v. | : | |
| | : | Submitted: June 6, 2023 |
| Pennsylvania Public Utility | : | |
| Commission, | : | |
| Respondent | : | |

BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE LORI A. DUMAS, Judge
HONORABLE STACY WALLACE, Judge

*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                                    FILED: July 6, 2023


This case is one of several actions pending in this Court in which Pennsylvania utility customers have challenged the installation of wireless "smart" meters (smart meters) in or on their homes pursuant to certain 2008 amendments to the Public Utility Code[1] (Code), collectively known as Act 129[2] (Act 129). In this appeal, Janice Denito Branagh (Branagh) petitions for review, *pro se*, of the November 14, 2019 opinion and order of the Pennsylvania Public Utility Commission (PUC) (PUC Decision). The PUC Decision adopted the initial decision of Administrative Law Judge (ALJ) Darlene D. Heep, in which the ALJ sustained, in part, and denied, in part,

---

[1] 66 Pa. C.S. §§ 101-3316.

[2] Act of October 15, 2008, P.L. 1592, No. 129, 66 Pa. C.S. § 2708(f).

Branagh's formal complaint against PECO Energy Company (PECO)[3] regarding its installation of smart meters in her home (ALJ Initial Decision).

In her petition for review (PFR), Branagh challenges the PUC Decision on several grounds. After careful review, we affirm.

## I.    BACKGROUND AND PROCEDURAL HISTORY

### A.    Act 129

The General Assembly enacted Act 129 in an attempt to reduce energy consumption and demand. *Romeo v. Pennsylvania Public Utility Commission*, 154 A.3d 422, 424 (Pa. Cmwlth. 2017). It addresses multiple subjects, including electricity distribution, service provider responsibilities, and smart meter technology. 66 Pa. C.S. § 2807(f); *Romeo*, 154 A.3d at 424.[4] Pertinent to this appeal, Act 129 imposes the following obligations on an electric distribution company (EDC) to furnish smart meter technology to its customers:

> (f) Smart meter technology and time of use rates.
>
> (1) Within nine months after the effective date of this paragraph, electric distribution companies shall file a smart meter technology procurement and installation plan with the [PUC] for approval. The plan shall describe the smart meter technologies the electric distribution company proposes to install in accordance with paragraph (2).
>
> (2) Electric distribution companies shall furnish smart meter technology as follows:

---

[3] PECO was a party to the proceedings below. On February 20, 2020, pursuant to Pennsylvania Rules of Appellate Procedure (Pa. R.A.P.) 123 and 1531, PECO filed an application to intervene as of right. We granted PECO's application by order exited March 4, 2020, therein designating PECO as an intervenor aligned with the PUC.

[4] The parties do not dispute and have assumed throughout this appeal that Act 129 applies to PECO.

(i) Upon request from a customer that agrees to pay the cost of the smart meter at the time of the request.

(ii) In new building construction.

(iii) In accordance with a depreciation schedule not to exceed 15 years.

66 Pa. C.S. § 2807(f). The term "smart meter technology" is defined as follows:

(g) *Definition.*—As used in this section, the term "smart meter technology" means technology, including metering technology and network communications technology capable of bidirectional communication, that records electricity usage on at least an hourly basis, including related electric distribution system upgrades to enable the technology. The technology shall provide customers with direct access to and use of price and consumption information. The technology shall also:

(1) Directly provide customers with information on their hourly consumption.

(2) Enable time-of-use rates and real-time price programs.

66 Pa. C.S. § 2807(g).

Section 1501 of the Code, which applies generally to a public utility's "service and facilities," provides, in pertinent part, as follows:

Every public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities, and shall make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and facilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public. Such service also shall be reasonably continuous and without unreasonable interruptions or delay. Such service and facilities shall be in conformity with the regulations and orders of the [PUC].

3

66 Pa. C.S. § 1501. Although consumers may lodge complaints to the PUC about a public utility's service and facilities under this section, the PUC may not sustain such a complaint unless a violation of Section 1501 is established. *West Penn Power Co. v. Pennsylvania Public Utility Commission*, 478 A.2d 947, 949 (Pa. Cmwlth. 1987).

### B.      Branagh's Case Before the ALJ and PUC

On November 16, 2016, Branagh filed a Formal Complaint (Complaint) with the PUC against PECO in which she argued that, due to health concerns, she did not want PECO to install smart meters in her home. (Supplemental Reproduced Record (S.R.R.) 0001b.) She further argued that PECO already had wrongfully installed a natural gas smart meter module against her wishes while she was at work.[5] (*Id.*; ALJ Initial Decision, 1-2; S.R.R. 0009b-10b.) Prior to filing the Complaint, Branagh exchanged correspondence with PECO in which she advised that she did not want the meters in her home. (S.R.R. 0012b-14b.) After PECO sent Branagh a 10-day service termination notice, she filed her Complaint with the PUC. Branagh attached to her Complaint a letter from her treating physician indicating that she has a history of sensitivity to chemicals and suffers from idiopathic angioedema. (S.R.R. 0002b-03b, 0007b.)

Branagh did not present any witnesses at the hearing before the ALJ. She testified on her own behalf and submitted three exhibits that were entered into the record: two letters from her treating physicians and a notice from the Equal Employment Opportunity Commission (EEOC) regarding the Americans with Disabilities Act (ADA) Amendments Act of 2008.[6] (Confidential Supplemental

---

[5] Although Branagh initially refused to permit PECO to install the gas smart meter module in her home, PECO did not communicate the refusals to its meter installers, who installed the smart meter module on September 28, 2016. (ALJ Initial Decision, 19-20; S.R.R. 027b-028b.)

[6] Pub. L. 110-325, 122 Stat. 3553 (2008).

4

Reproduced Record (C.S.R.R.) 0053c-55c.) The letters from Branagh's physicians indicated that she currently is under care for cardiac issues, is sensitive to certain chemicals, and suffers from idiopathic angioedema. (*Id.*) Branagh testified that she has a history of health problems and that she believes that the gas smart meter module already installed in her home could be exacerbating her symptoms. She readily admitted, however, that she does not know whether her symptoms have worsened because of the smart meter installation and that she has not discussed the smart meter with her doctor. (C.S.R.R. 0004c-07c, 0017c, 0018c-21c.) Branagh attempted to introduce into the record certain scientific studies regarding smart meters and their potential health risks that she found on the internet while doing her own research. None of the materials had been presented to the PUC in any proceeding. (*Id.* at 0006c-0013c.) PECO objected to the exhibits as inadmissible hearsay, and the ALJ did not admit them. (*Id.* at 0009c-11c, 0014c.). Branagh did not object to the ALJ's ruling.

PECO presented the testimony of three expert witnesses: Glenn Pritchard, P.E.; Christopher Davis, Ph.D.; and Mark Israel, M.D. Pritchard testified that the smart meter technology PECO utilizes emits very low radio frequency (RF) levels and does not produce the type of emissions that most concerned Branagh. (S.R.R. 0134b-43b, 0163b.) Dr. Davis testified that PECO's new smart meters reduce RF emissions by 83% compared with PECO's older meters, including one installed at Branagh's home. He also testified that the RF emissions from the new smart meters are very small, have no scientifically established health effects, are millions of times smaller than the standards set by the Federal Communications Commission (FCC), and are many times smaller than other electrical devices already located in Branagh's home. (S.R.R. 0177b-199b.) Dr. Israel testified regarding the potential health effects of RF emissions from the smart meters. He reviewed the medical records submitted by Branagh and

5

her health conditions and opined that there is no reliable medical evidence indicating that the RF emissions from PECO's smart meters would cause, contribute to, or exacerbate the conditions or symptoms Branagh reported. (C.S.R.R. 0028c-52c.)

PECO also presented testimony demonstrating that it offered Branagh certain accommodations in an attempt to alleviate her concerns about the smart meters, including moving them to a more distant location at her residence. Branagh declined the accommodation and indicated that replacement analog meters were the only accommodation she would accept. (S.R.R. 0090b, 0115b, 0147b, 0114b-15b.)

In her Initial Decision, the ALJ concluded that Branagh "has not met her burden of proof of establishing with substantial evidence that PECO committed an offense in violation of the [Code], the [PUC]'s regulations or an outstanding order of the [PUC] with respect to health concerns regarding PECO meters." (*Id.* at 0032b.) The ALJ further found, however, that Branagh did meet her burden to establish that PECO's installation of its gas smart meter module at Branagh's residence was "unreasonable" under Section 1501. (*Id.* at 0009b, 0033b). Pursuant to Section 3301 of the Code, 66 Pa. C.S. § 3301, the ALJ imposed a $500.00 civil penalty for the violation. (*Id.* at 0033b.)

On January 30, 2018, Branagh filed five exceptions to the ALJ Initial Decision. Therein Branagh argued that (1) the ALJ did not adequately describe or consider her medical conditions and symptoms; (2) Dr. Israel should not have been designated as an expert witness; (3) the ALJ applied the incorrect burden of proof and erred in concluding that Branagh did not carry her burden to establish a Section 1501 violation; (4) the ALJ erred in not permitting Branagh to delay installation of a smart meter in her home; and (5) the ALJ erred in not considering the scientific articles that

she attempted to introduce into the record. The PUC denied all of Branagh's exceptions and adopted the ALJ Initial Decision.

In relevant part,[7] the PUC re-affirmed that Branagh had the burdens of proof and persuasion to establish a violation of Section 1501. (S.R.R. 0040b-43b.) Regarding the specific burden applicable to Branagh's Section 1501 claim, the PUC stated that Branagh was required to "demonstrate by a preponderance of the evidence a 'conclusive causal connection' between the harm to human health and the RFs from the [smart meter]." (*Id.* at 0045b.) The PUC further concluded that Branagh failed to establish her initial burden of proof because she did not introduce any evidence establishing any adequate causal connection between the smart meter and the alleged adverse effects to her health:

> Based on our review of the record in this proceeding, we determine that [Branagh] did not establish her initial burden of proof. [ ] Branagh did not introduce evidence into the record to demonstrate a conclusive causal connection between the low-level RF fields from PECO's smart meter and adverse health effects for [ ] Branagh. [ ] Branagh testified that she is concerned about RFs emanating from the [smart] meters and that this may cause or aggravate her specific health conditions and symptoms. [ ] Branagh provided testimony about her specific health conditions and symptoms, including those that she states she has developed since the gas meter module was installed at her home. [ ] Branagh also presented two letters from her physicians . . . indicating that she was being treated for certain health conditions and symptoms. In presenting her case, however, [Branagh] did not offer medical or scientific expert opinion testimony on the issue of whether [her] exposure to the RF emissions from PECO's [smart] meter caused or will cause adverse health effects [ ]. Based on the evidence presented,

---

[7] The issue raised in Branagh's fourth exception, installation delay, is not at issue in this appeal.

[Branagh] essentially has left it to us to infer that [her] health symptoms are caused by RF emissions from PECO's [smart] meter. While we recognize that a complainant may establish a prima facie case with circumstantial evidence, Branagh's testimony and the letters from the physicians regarding their treatment of [her] health symptoms experienced or observed at, around and after the time PECO installed the gas meter module at her home are not sufficient to support such an inference. The timing of the installation of the [smart meter] and [Branagh's] health symptoms do[es] not "speak for itself" in terms of a causal connection. Nor does the evidence of Branagh's health symptoms imply that exposure to RF emissions from a PECO [smart] meter caused or will cause the symptoms.

(*Id.* at 0055b-56b.) The PUC also determined that Act 129 does not provide for an automatic opt-out that would permit delay in installation and that PECO's smart meters did not violate the Code or any PUC regulation or order. (*Id.* at 0058b.)

Regarding Branagh's evidentiary challenges, the PUC concluded that the ALJ adequately permitted Branagh to testify about her medical conditions and the articles she retrieved in her online research. The PUC nevertheless concluded that those documents properly were excluded from the record before the ALJ and that, even if they had been admitted, they would not have been sufficient to establish any additional facts. (*Id.* at 0059b-60b.) Regarding Branagh's challenge to Dr. Israel's qualifications, the PUC concluded that he properly was qualified as an expert on the issues of RF and its effects on human health. (*Id.* at 0054b.)

Having denied all of Branagh's exceptions, the PUC adopted the ALJ Initial Decision. (*Id.* at 0061b.) Branagh filed her *pro se* PFR in this Court on January 8, 2020.[8]

### C. *Povacz* **and Related Smart Meter Cases**

### 1. **Commonwealth Court Proceedings**

Several similar complaints were filed with the PUC by other Pennsylvania utility customers seeking exemptions from PECO's smart meter requirement. A number of appeals from the PUC's decisions on those complaints were filed in this Court, three of which we consolidated and heard together. *See Povacz v. Pennsylvania Public Utility Commission* (Pa. Cmwlth., No. 492 C.D. 2019); *Murphy v. Pennsylvania Public Utility Commission* (Pa. Cmwlth., No. 606 C.D. 2019); and *Randall v. Pennsylvania Public Utility Commission* (Pa. Cmwlth., No. 607 C.D. 2019) (together, *Povacz*). The other actions (including the instant case), although at times administratively managed together, are not consolidated. *See Paul v. Pennsylvania Public Utility Commission* (Pa. Cmwlth., No. 460 C.D. 2019); *Hoffman-Lorah v. Pennsylvania Public Utility Commission* (Pa. Cmwlth., No. 712 C.D. 2019); *Hughes v. Pennsylvania Public Utility Commission* (Pa. Cmwlth., No. 827 C.D. 2020); *Ulmer v. Pennsylvania Public Utility Commission* (Pa. Cmwlth., No. 967 C.D. 2020); *Schmukler v. Pennsylvania Public Utility Commission* (Pa. Cmwlth. No. 1102 C.D. 2019); *Hess v. Pennsylvania Public Utility Commission* (Pa. Cmwlth., No. 1155 C.D. 2020); *Lucey v. Pennsylvania Public Utility Commission* (Pa. Cmwlth., No. 1212 C.D. 2020); *McKnight v. Public Utility Commission* (Pa. Cmwlth., No. 1253 C.D. 2019); *Myers v. Pennsylvania Public Utility Commission* (Pa. Cmwlth., No. 1337 C.D. 2019); and

---

[8] On December 12, 2019, Branagh filed a *pro se* letter in this Court in which she attempted to appeal the PUC Decision. On December 13, 2019, our prothonotary advised Branagh by letter that she must file a petition for review to perfect the appeal. She did so on January 8, 2020.

*Sunstein v. Public Utility Commission* (Pa. Cmwlth., No. 1581 C.D. 2019) (collectively, Non-consolidated Smart Meter Cases).[9]

On October 8, 2020, this Court, sitting *en banc*, issued a decision in *Povacz*. *See Povacz v. Pennsylvania Public Utility Commission*, 241 A.3d 481 (Pa. Cmwlth. 2020) (*Povacz I*), *aff'd in part and rev'd in part,* 280 A.3d 975 (Pa. 2022) (*Povacz II*). Therein, we described the petitioners' (*Povacz* Consumers) allegations, in pertinent part, as follows:

> [*Povacz*] Consumers are customers in PECO's electricity service area. They claim they are hypersensitive to emissions of [RF]. They have health issues they contend are or may be worsened by RF exposure. They have taken extraordinary measures to eliminate RF in their home environments and to minimize their RF exposure elsewhere. They provided expert medical evidence from their treating physicians that their exposure to RF should be minimized in order to avoid risks of harm to their health. They also offered expert testimony that emerging research indicates health risks at much lower levels of RF exposure than current federal regulations allow.
>
> [*Povacz*] Consumers currently have automatic meter reading (AMR) meters at their homes. [*Povacz*] Consumers received notices from PECO that wireless smart meters would be installed in or on their homes to replace their current electric meters. They informed PECO that they would not allow installation of the replacement meters because of the RF emitted by wireless smart meters. PECO notified them that their electricity would be cut off entirely unless they allowed installation of wireless smart meters. [*Povacz*] Consumers

---

[9] In another smart meter case, *Hanley v. Pennsylvania Public Utility Commission* (Pa. Cmwlth., No. 172 C.D. 2020), the PUC praeciped to strike the Hanleys' petition for review because they previously had sought, and the PUC had granted, reconsideration of the Hanleys' complaint against Pennsylvania Power Company. By order exited July 17, 2020, we struck the Hanleys' petition for review as inoperative pursuant to Pa R. A. P. 1701(b)(3) ("A timely order granting reconsideration under this paragraph shall render inoperative any such notice of appeal or petition for review of a quasijudicial order theretofore or thereafter filed or docketed with respect to the prior order.").

then filed complaints with the PUC seeking to avoid forced installation of wireless smart meters in or on their homes.

An [ALJ] sustained, in part, PECO's preliminary objections to the complaints. The ALJ found that opting out of smart meter installation was not an available remedy under the law. However, the ALJ allowed the complaints to go forward for determinations of whether the individual [*Povacz*] Consumers were entitled to accommodations in light of their health issues.

After several omnibus hearings, the ALJ found one of the [*Povacz*] Consumers, Maria Povacz, had demonstrated a prima facie case that attaching a smart meter to her home would exacerbate her health condition. The ALJ ordered PECO to move Ms. Povacz'[ ] meter socket away from her house and absorb the cost of moving it. The ALJ otherwise denied relief to Ms. Povacz. The ALJ denied all relief to the other [*Povacz*] Consumers.

[*Povacz*] Consumers filed exceptions with the PUC. PECO filed exceptions to the portion of the ALJ's decision regarding Ms. Povacz that required relocation of her meter. The PUC overruled [the] exceptions, granted PECO's exception, and denied all relief . . . . [The *Povacz*] Consumers then filed petitions for review in this Court.

*Id.* at 483-84 (footnotes omitted). In their appeals, the *Povacz* Consumers argued, in relevant part, that (1) the mandatory installation of smart meters with no "opt-outs" for consumers violated their constitutional liberty interest in personal bodily integrity; (2) Act 129 does not mandate the installation of smart meters without affording reasonable accommodations to customers who are trying to avoid RF emissions; and (3) the PUC applied an incorrect burden of proof to the claims under Section 1501 by requiring a "conclusive causal connection" between RF exposure and adverse health effects. *Id.* at 485.

11

Regarding the claim that mandatory smart meter installation violated the fundamental Fourteenth Amendment[10] right to bodily integrity, this Court, following the reasoning of the United States District Court for the Northern District of Illinois in *Naperville Smart Meter Awareness v. City of Naperville*, 69 F. Supp. 3d 830 (N.D. Ill. 2014) (*Naperville II*), concluded that allegations that smart meters increased the risk of injury to health were insufficient to state a Fourteenth Amendment claim. *Id.* at 487. Likewise, we also concluded that, even assuming that the *Povacz* Consumers had a cognizable liberty interest in their bodily integrity, their constitutional claim was not viable because they failed to plead facts showing that mandatory smart meter installation was arbitrary. *Id.* at 487. We accordingly declined "to recognize a viable claim by [the *Povacz*] Consumers regarding a violation of their Fourteenth Amendment liberty interests in bodily integrity" and affirmed the PUC's dismissal of the constitutional claim. *Id.* at 488.

Regarding accommodations, however, we concluded that Act 129 did not, by its plain language, mandate the installation of smart meters in every consumer's home without reasonable accommodation. We therefore concluded that the PUC erred in its interpretation of Act 129:

> [A]lthough Act 129 does appear to anticipate installation of smart meters on customers' premises, nothing in the language of Act 129 facially requires every customer to endure involuntary exposure to RF emissions from a smart meter. Rather, the language of Act 129 seems calculated to support customer choice in the use of smart meter technology. Therefore, we conclude that Act 129 does not preclude either PECO or the PUC from accommodating a customer's request to have RF emissions from that customer's meter turned off, to have a smart meter relocated to a point remote from the customer's house, or some other reasonable accommodation.

---

[10] U.S. Const. amend. XIV, § 1.

12

> We reverse that portion of the PUC's decisions finding it lacked authority for accommodations of customers' requests to avoid RF emissions. We remand to the PUC to allow consideration of [the *Povacz*] Consumers' requests for accommodations, and determination of what, if any, accommodations are appropriate, in light of this Court's conclusion that Act 129 does not forbid such accommodations.

*Id.* at 490.

Regarding the burden of proof that a consumer bears in establishing a violation of Section 1501, we concluded that a consumer may establish a violation by proving that a service or facility is *either* unreasonable *or* unsafe, and may, but need not, establish both. *Id.* at 491. We further opined as follows regarding the applicable burden of proof to establish that a service or facility is causing adverse health effects:

> The PUC found [that] the ALJ correctly imposed a burden of proof requiring [the *Povacz*] Consumers to demonstrate adverse health effects by a preponderance of the evidence. This required [the *Povacz*] Consumers to prove that there was a "conclusive causal connection" between RF exposure from smart meters and adverse human health effects.

> The PUC concedes [that the *Povacz*] Consumers were not required to prove harm had actually occurred; the PUC's authority extends to claims seeking to prevent harm. However, where prevention of harm was [the *Povacz*] Consumers' aim, the burden of proof still required demonstration by a preponderance of the evidence that the utility's proposed conduct would create a proven exposure to harm. The PUC argues that although the occurrence of harm need not be certain, or even probable, [*Povacz*] Consumers incorrectly equated any hazard, however slight, with exposure to harm. The [court in *Naperville Smart Meter Awareness v. City of Naperville* (N.D. Ill., No. 11 C 9299, filed Mar. 22, 2013), 2013 WL 1196580 (*Naperville I*),] considered this issue and found that even without an option to deactivate the

13

radio transmitters in the smart meters, the plaintiffs' claim would not have been viable. Like [the *Povacz*] Consumers here, the *Naperville I* plaintiffs based their claim on a theory that the radio waves emitted from the smart meters, together with other RF-wave-emitting devices in the environment, have the potential to be harmful. The court in *Naperville I* acknowledged the plaintiffs' contention that certain doctors believe that over time the public's cumulative exposure to low-level RF from devices such as cell phones, radio towers, and smart meters may pose health risks, such that more accurate guidelines and standards regarding the safety of RF exposure are necessary. Nonetheless, the court concluded the bare allegation that it is unknown whether [the] plaintiffs are actually being harmed by the level of RF waves emitted from one smart meter is insufficient to raise a claim for relief that is more than speculative.

The reasoning of *Naperville I* concerning the applicable burden of proof is persuasive. We therefore affirm the burden applied by the PUC concerning proof of harm from RF emissions.

*Id.* at 493-94 (internal citations and quotations omitted). Based on our disposition of the issues, we held as follows:

Based on the foregoing discussion, we affirm the PUC's rejection of [the *Povacz*] Consumers' constitutional challenge. We reverse the PUC's conclusion that it lacks authority to accommodate [the *Povacz*] Consumers' desire to avoid RF emissions from smart meters and vacate the PUC's determination that such accommodation would not be reasonable. We affirm the PUC's determination of the burden of proving harm. We affirm the PUC's findings of fact. We remand this matter to the PUC for determinations of whether accommodations are appropriate for each of the [*Povacz*] Consumers, and if so, what those accommodations should be. On remand, the PUC should consider all reasonable accommodations, including, but not limited to, deactivation of the RF emitting functions of the smart meters; installation of the smart meters at locations remote from [the *Povacz*]

14

Consumers' homes; and installation of wired rather than wireless smart meters, if . . . such technology is available.

*Id.* at 494-95.  The PUC, PECO, and the *Povacz* Consumers petitioned for allowance of appeal to the Pennsylvania Supreme Court, which granted review.[11]

### 2.  The Pennsylvania Supreme Court's Decision in *Povacz*

The Supreme Court granted review of five questions, all of which involved two overarching issues: (1) whether Act 129 mandates universal installation of smart meters without an "opt-out" mechanism for consumers; and (2) whether the PUC applied the correct burden of proof to the *Povacz* Consumers' claims under Section 1501.  *Povacz II*, 280 A.3d at 988-89. The Supreme Court ultimately affirmed, in part, and reversed, in part.  Pertinent to the instant case, the Supreme Court concluded that Act 129 mandates that EDCs like PECO "furnish smart meters to all electric customers within an electric distribution service area and does not provide electric customers the ability to opt out of having a smart meter installed."  *Povacz II*, 280 A.3d at 983.  *See also id.* at 998 ("Considering the overall goal of Act 129 to promote energy efficiency and conservation in Pennsylvania, the plain language of Section 2807(f)(2) mandates the system-wide installation of smart meter technology, including smart meters, with no opt-out provision.  We reject the Commonwealth Court's contrary holding that, although EDCs are required to furnish smart meters, customers may choose to reject one.").

On the question of the availability of accommodations under Section 1501, the Court went on to opine:

---

[11] By Orders exited on December 15, 2020, and July 1, 2021, this Court stayed the proceedings in the Non-consolidated Smart Meter Cases pending the Pennsylvania Supreme Court's decision in *Povacz II*.

15

A customer seeking affirmative relief from the PUC must prove by a preponderance of the evidence that the named utility was responsible or accountable for the problem described in the complaint and that the offense was a violation of the Code, a PUC regulation or Order, or a violation of a PUC-approved tariff.

Although Act 129 does not provide an electric customer with the right to opt-out of the installation of a smart meter at [his or her] residence, [he or she] may file a complaint raising a claim that installation of a smart meter violates Section 1501 of the Code.

. . . .

Pursuant to this section, an EDC (as a public utility) must provide service that is, inter alia, both safe and reasonable. To carry [his or her] burden of proof on a Section 1501 claim, a smart meter challenger may be required to present medical documentation and/or expert testimony demonstrating that the furnishing of a smart meter constitutes unsafe or unreasonable service in violation of Section 1501 under the circumstances presented.

. . . .

*Id.* at 999-1000.  On the question of how a consumer may prove a violation of Section 1501 by a "preponderance of the evidence," the *Povacz II* Court directed:

The preponderance burden requires a customer to prove that a service or facility is—more likely than not—the cause of the problem described in [his or her] complaint. Specific to smart meters and RF emissions, the burden is two-fold. First, a customer must present expert opinion rendered to a reasonable degree of scientific certainty that smart meters emit RFs and that RF emissions cause adverse health effects and, second, expert opinion rendered to a reasonable degree of medical certainty that RF emissions from the smart meters, either alone or cumulative to other sources of RF emissions, caused [ ] harm.  Once the [complainant] produces such

16

evidence, the utility may then defend by providing scientific and/or medical expert testimony that, within a reasonable degree of certainty, the RF emissions from smart meters did not cause the alleged harm. The fact finder must then weigh the evidence and decide whether it is more likely than not that the smart meter causes harm to the customer.

. . . .

"Conclusive causal connection" means that the proffered evidence must support the conclusion that a causal connection existed between a service or facility and the alleged harm. It is not possible for evidence that is inconclusive to be sufficient to meet the preponderance of the evidence standard. Inconclusive means that the evidence does not lead to a conclusion of a definite result one way or the other. While the preponderance of the evidence standard is not stringent, it does require that the plaintiff's evidence ever so slightly (like, with the weight of a feather) supports the plaintiff's contention. Evidence that does not support a conclusion (or is inconclusive) cannot meet that minimal burden. . . . Thus, where scientific evidence is required to establish the safety of a service or facility, use of the evidentiary standard of "conclusive causal connection" to assess the evidence is correct.

A customer's evidence certainly need not be based on absolute certainty, thereby removing all doubt that a factual assertion is correct. However, evidence of a mere possibility that harm could result is never sufficient to meet a preponderance of the evidence standard.

*Id.* at 1006-07. Applying this standard to the *Povacz* Consumers' requests for opt-out accommodations, the Court concluded:

Claiming an unfettered right to avoid RF emissions, [*Povacz* Consumers] request accommodation based on their medical histories and demonstrated desire to avoid or minimize exposure to RF emissions. They consider the appropriate

17

relief to be the removal of wireless smart meters installed on their properties and the installation of an alternative meter. In response, [PUC and PECO] object to having to provide [*Povacz* Consumers] with accommodations absent a finding that smart meter technology violates Section 1501.

Pursuant to our interpretation of Act 129 as mandating the installation of smart meter technology, a customer may not prevent the installation of a smart meter. That said, a customer is not without recourse, as the provision of accommodations is a function of Section 1501, not of Act 129. Indeed, absent a mandate, there would be no need for the complaint procedure provided in the Code to electric customers who oppose installation of a smart meter. As in this case, a customer can file a claim under Section 1501 that smart meter technology service is unsafe and/or unreasonable. If the customer establishes by a preponderance of the evidence based on the totality of the circumstances that smart meter service violates Section 1501, [he or she] [is] entitled to an accommodation to the extent allowed by Act 129 and a utility's tariff. Thus, by operation of the statute, an EDC cannot be required to provide accommodation without the finding of a Section 1501 violation.

. . . .

Act 129 is mandatory, requiring the system-wide installation of smart meter technology by EDCs, including smart meters. Although electric customers are not entitled to opt out of having a smart meter installed at their home, the PUC is authorized to determine and prescribe a remedy to individual customers who establish a violation of Section 1501 by a preponderance of the evidence that furnishing smart meter technology to them is unsafe or unreasonable. Reference to a preponderance of the evidence burden of proof and a "conclusive causal connection" evidentiary standard to assess whether expert evidence meets that burden is not inconsistent. The burden for proving a safety or reasonableness violation under Section 1501 is the same, where the challenge is based on the effect on the health of the customer.

18

*Id.* at 1013-14 (citation and footnote omitted).[12]

## II.   ISSUES PRESENTED[13]

From what we can glean from Branagh's PFR and brief, she raises multiple issues that fairly can be combined and reorganized as follows: (1) whether Act 129's mandatory smart meter requirement with no "opt-out" accommodation to consumers is unconstitutional; (2) whether the PUC applied the correct burden of proof to Branagh's Section 1501 claim, and whether the PUC erred in concluding that she did not satisfy her burden; (3) whether the PUC erred in excluding Branagh's proffered scientific articles and admitting Dr. Israel's testimony as expert opinion; and (4) whether federal standards for RF emissions should be applied to PECO's smart meters.

## III.   DISCUSSION

### A.   Act 129

Branagh's first group of issues are controlled by the decisions in *Povacz I* and *Povacz II*.  It is now beyond dispute that Act 129 imposes a mandatory smart meter installation requirement.  It also is beyond dispute that Act 129 does not itself provide for an "opt-out" by consumers who do not want smart meters in their homes.  Rather, consumers who wish to receive reasonable accommodations for health and safety reasons must establish a violation of Section 1501 of the Code.  Any argument that Branagh makes on appeal that the PUC misinterpreted Act 129 therefore is foreclosed by *Povacz II*.  Branagh does not identify how or under what law Act 129's requirements are unconstitutional or discriminatory, but to the extent that she alleges due process

---

[12] On September 29 and 30, 2022, the PUC and PECO filed status reports in this Court summarizing the Supreme Court's decision in *Povacz II* and arguing that the decisions in *Povacz I* and *Povacz II* are dispositive of all of the issues raised in Branagh's appeal.

[13] "This Court's review is limited to determining whether the [PUC] violated constitutional rights, committed an error of law, rendered a decision not supported by substantial evidence, or violated its rules of practice." *Povacz I*, 241 A.3d at 484 n.5 (citation omitted).

violations, this Court rejected such arguments in *Povacz I*, and the Pennsylvania Supreme Court did not grant review on that question. It also is undisputed in the record that PECO offered certain accommodations to Branagh, including repositioning the smart meters to other locations to minimize potential RF exposure. Branagh rejected that and all other accommodations offered by PECO.

We thus conclude that Branagh's challenges to Act 129 are without merit.

## B. Burden of Proof

Branagh next challenges the burden of proof applied by the PUC to her Section 1501 claim and the PUC's conclusion that she did not satisfy that burden. We again discern no error. As noted above, in *Povacz II,* the Pennsylvania Supreme Court reaffirmed that a consumer challenging the safety of public utility services or facilities under Section 1501 must establish, by a preponderance of the evidence, that the challenged services or facilities more likely than not caused the complained-of adverse health effect. In other words, the consumer must establish a "conclusive," and not speculative, causal connection. To satisfy that burden here, Branagh was required to present expert testimony establishing both that PECO's smart meters and their RF emissions cause adverse health effects generally and that they in fact caused or exacerbated Branagh's health problems. Branagh did not present any expert medical testimony establishing either of these elements of her claim. Although she submitted certain medical records, those records did not establish that any of her health problems stem from smart meter RF emissions. Branagh candidly admitted throughout her testimony that she does not know whether the RF emissions caused any adverse health effects. Given certain correlations in time, she merely suspects that they might have contributed. *See* C.S.R.R. 0004c, 0006c-07c, 0017c, 0020-21c. The PUC therefore did not err in concluding that Branagh failed to carry her burden to establish a

20

"conclusive causal connection" between smart meter RF emissions and any adverse health effects.

Further, even had Branagh carried her initial burden of proof, a public utility may nevertheless present its own expert opinion evidence to rebut the consumer's evidence. Here, PECO presented three witnesses that collectively testified that the RF emissions from PECO's smart meters are many times lower than both FCC standards and other electronic devices in Branagh's home. PECO also presented expert medical testimony that, given Branagh's medical records, there is no conclusive causal connection between the installation of the smart meter in Branagh's residence and any adverse effects to her health. The PUC was free to, and did, give more weight to this evidence in making its findings, and we will not disturb the PUC's credibility and weight-of-the-evidence determinations on appeal.

The PUC both applied the correct burden of proof to Branagh's Section 1501 claim and did not err in concluding that Branagh did not satisfy that burden. Branagh's arguments to the contrary are without merit.

## C.    Evidentiary Issues

Branagh next argues that the PUC erred in excluding from the record certain articles that she attempted to introduced to establish the adverse health effects caused by RF emissions exposure. She also argues that the PUC erred in receiving Dr. Israel's testimony as expert opinion. We again discern no error.[14]

---

[14] Branagh first raised these evidentiary issues in her exceptions to the ALJ Initial Decision. In reviewing an ALJ's Initial Decision, the PUC has all of the powers which it would have had in making the initial decision. *See* 66 Pa. C.S. § 335(a); *Energy Pipeline Company v. Pennsylvania Public Utility Commission*, 662 A.2d 641, 644 (Pa. 1995). The PUC accordingly considered these evidentiary questions, and we will do the same on appeal.

With regard to Branagh's proffered exhibits that were not admitted into the record, Branagh argues in her brief that they should have been admitted as viable scientific studies that support her claim that smart meters pose health risks to humans. (Branagh Br. at 12.) The PUC addressed this argument and concluded as follows:

> Based on our review of the record, we find that [Branagh] did not provide sufficient evidence from medical experts and medical societies to satisfy her burden of proof in this case. [Branagh] presented a letter from the [American Academy of Environmental Medicine] as well as other articles and documents, some of which were obtained from the internet. The ALJ did not admit these documents into the record, based on PECO's hearsay objection[.] [H]owever, the ALJ permitted [ ] Branagh to testify regarding her research and her concerns based on that research. [ ] We conclude that the ALJ's ruling to exclude the documents from the record was proper under the Pennsylvania Rules of Evidence [Pa. R.E.], because the documents constitute hearsay (out of court statements made by the authors of the documents that were offered by [Branagh] to prove the truth of the matter asserted in the documents), and do not fall within one of the recognized exceptions to the rule against hearsay. Even if these studies had been admitted into evidence without PECO's objection, the studies would have been insufficient to support a finding of fact in this proceeding pursuant to the *Walker/Chapman*[15] rule because [ ] Branagh did not present any other non-hearsay, competent evidence to corroborate the documents.

(PUC Decision, 25-26; S.R.R. 0059b-60b.) (citations omitted). We agree with the PUC's assessment and discern no error, particularly given that Branagh did not object to the exclusion of these documents from the record.

---

[15] *See Walker v. Unemployment Compensation Board of Review*, 367 A.2d 366, 370 (Pa. Cmwlth. 1976); *Chapman v. Unemployment Compensation Board of Review*, 20 A.3d 603, 610 n. 8 (Pa. Cmwlth. 2011).

22

With regard to Dr. Israel, the PUC noted that Dr. Israel was qualified as an expert witness in the fields of medicine, medical research, and health related to "power frequency fields and [RF] fields" and that "[ ] Branagh stated that she did not object to Dr. Israel's qualification as an expert." (PUC Decision, 19; S.R.R. 0053b.) The PUC concluded that, given his extensive credentials, *see* S.R.R. 0211b-18b, Dr. Israel properly was qualified as an expert under Pa. R.E. 702 and testified credibly regarding the relationship between RF emissions and human health. (PUC Decision, 20; S.R.R. 0054b.) The PUC further concluded that "Dr. Israel's unequivocal opinion satisfies PECO's burden of production and constitutes legally competent evidence to support a finding on the issue of a causal connection between RF fields from a [smart meter] and adverse human health effects." (*Id.*) Based on our review of Dr. Israel's credentials and testimony, and given the fact that Branagh did not object to his certification as an expert, we discern no error in the PUC's consideration of his testimony as expert opinion.

### D. Federal Legislation and FCC Regulations

Branagh argues finally that an interpretation of Act 129 as mandating smart meter installation "with no regard for health exemptions" violates the federal Radiation Control for Health and Safety Act of 1968 (RCHSA)[16] and the federal Energy Policy Act of 2005 (EPACT).[17] (Branagh Br. at 11.) She further argues that the FCC regulations referenced and relied upon by the PUC are invalid.

---

[16] RCHSA is codified in the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 360hh-360ss.

[17] Pub. L. No. 109–58, 119 Stat. 594 (2005). Section 1252 of EPACT amended the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C. § 2621(d), to add provisions relating to smart metering. PURPA allows state regulatory authorities, like the PUC, to adopt standards or rules affecting electric utilities that are different from the standards set forth in 16 U.S.C. §§ 2621-2627. *See* 16 U.S.C. § 2627(b).

23

Branagh's arguments based on federal law fail for at least two reasons. First, these issues were not raised before the PUC and, therefore, are waived on appeal. *See* Pa. R.A.P. 1551(a) ("Review of quasijudicial orders shall be conducted by the court on the record made before the government unit. Only questions raised before the government unit shall be heard or considered . . . ."). Certain exceptions to this waiver rule exist, but none apply here. *See id.* Second, regarding Branagh's challenges to Act 129 based on RCHSA and EPACT, even assuming that these issues had been raised before the PUC, and further assuming that the PUC would have had jurisdiction to consider them, Branagh's arguments are based on a mischaracterization of how Act 129 has been interpreted by the PUC, this Court, and the Pennsylvania Supreme Court. Neither the PUC, nor this Court in *Povacz I*, nor the Pennsylvania Supreme Court in *Povacz II*, interpreted Act 129 to mandate smart meter installation without regard to health-based exemptions. Rather, as has now been made clear, although Act 129 does not itself contain an automatic opt-out provision based solely on consumer preference, a consumer nevertheless may obtain accommodations, including a potential exemption, if he or she can establish a violation of Section 1501. Thus, Branagh's characterization of Act 129 is inaccurate and cannot form the basis of any claims based on any alleged inconsistencies with federal law.[18]

## IV.   CONCLUSION

Because we conclude that all of Branagh's issues on appeal are without merit or waived, we affirm the PUC.

_____
PATRICIA A. McCULLOUGH, Judge

---

[18] *See also Romeo*, 154 A.3d at 428 (Act 129 does not violate, and is not preempted by, EPACT because the federal standards set forth therein are supplemental to state standards; each state is required to consider the federal standards, but nevertheless may adopt different standards).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Janice Denito Branagh,      :
          Petitioner      :
                        :  No.  1857 C.D. 2019
          v.             :
                        :
Pennsylvania Public Utility      :
Commission,                :
          Respondent     :

## ***ORDER***

AND NOW, this 6th day of July, 2023, the November 14, 2019 order of the Pennsylvania Public Utility Commission hereby is AFFIRMED.


_____
PATRICIA A. McCULLOUGH, Judge